1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BOARDS OF TRUSTEES OF THE
NORTHWEST IRONWORKERS HEALTH
AND SECURITY FUND, et al.,

Plaintiffs,

v.

WESTERN REBAR CONSULTING INC.
d/b/a WESTERN INDUSTRIES, INC., et
al.,

Defendants.

CASE NO. 2:18-cv-00486-RAJ-BAT

**REPORT AND
RECOMMENDATION**

Plaintiffs Boards of Trustees of the Northwest Ironworkers Health and Security Fund

("Trust Funds") file this second motion to dismiss the Counterclaim of Defendant Western Rebar

Consulting, Inc., d/b/a Western Industries, Inc. ("Western"). Dkt. 42. The undersigned granted

Trust Fund's first motion to dismiss Western's counterclaim, without prejudice and with leave to

amend. Dkt. 34.[1] Western filed an Amended Counterclaim on August 3, 2020. Dkt. 41. Trust

Funds seek dismissal of the amended counterclaim pursuant to Fed. R. Civ. P. 12(b)(6) for

failure to state a claim. Dkt. 42.

The undersigned recommends that the motion to dismiss (Dkt. 42) be denied.

---

[1] Thereafter, this case was reassigned to the Honorable Richard A. Jones, pursuant to the parties'
Joint Status Report. Dkt. 36, 39.

REPORT AND RECOMMENDATION - 1

BACKGROUND

A.     <u>Background of Dispute</u>

The Trust Funds are multiemployer, collectively bargained, employee benefit plans regulated by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et seq. ("ERISA"), and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5). In accordance with the LMRA, the Trust Funds are administered by joint labor-management Boards of Trustees, half of whom are appointed by the Northwest Ironworkers District Council and half of whom are appointed by the participating employers who negotiate with the District Council. All Trustees serve without compensation. Dkt. 43, Declaration of Michelle Hill, ¶ 2.

The Trust Funds are administered by a third-party administrator, Welfare and Pension Administration Services, Inc. ("WPAS"). Dkt. 43, Hill Decl., ¶ 1, WPAS's responsibilities include, but are not limited to, maintaining records on behalf of the Trust Funds, administering benefits, and responding to participants. *Id.*, ¶ 3. WPAS is responsible for maintaining copies of the Trust Agreements, signatory employers' Independent Agreements, or other agreements to be bound, Master Labor Agreements, employer remittance reports, employer payroll audits, the contributions reported to the Trust Funds and the contributions paid to the Trust Funds. *Id.*, ¶ 4.

The Trust Funds are primarily funded by employer contributions. Dkt. 43, Hill Decl., ¶ 5. The employer's obligation to contribute to the Trust Funds arises from the employer's Independent Agreement which binds them to the Master Labor Agreement ("MLA"). *Id.*, ¶ 6. The MLA determines the scope of covered work for which an employer must submit contributions and how (*e.g.* per hour worked or per hour paid) the employer contributes to the Trust Funds. *Id.*, ¶ 7. Only those employees performing work covered by the MLA are eligible for benefits from the Trust Funds. *Id.*, ¶ 8. The employees who perform covered work and the

contributions are reported to the Trust Funds by the employer on a per hour paid basis. *Id.*, ¶ 9. The Trust Funds are not a party to the MLA. *Id.*, ¶ 10.

WPAS sends a monthly report to signatory employers called a "remittance report" to facilitate the employer's reporting to the Trust Funds. Dkt. 43, Hill Decl., ¶ 11. Employers are responsible for submitting their completed remittance forms and contributions by the 15th of the month following the month worked. *Id.*, ¶¶ 12-14. The Trust Funds rely on employers to accurately report and contribute on behalf of their employees. *Id.*, ¶ 14.

To confirm that signatory employers are accurately reporting the covered hours worked by its employees and properly paying contributions to the Trust Funds, the Trust Funds perform payroll audits. Dkt. 43, Hill Decl., ¶ 15. An auditor reviews the Trust Funds' records along with the employer's records; confirms the employers have contributed on all covered hours on behalf of all employees performing covered work (not just union members); confirms the employer is reporting in accordance with the terms in of the MLA; and, confirms that the employer is only reporting individuals who are eligible for benefits. *Id.*, ¶¶ 16, 17. If an employee is reported, but not eligible for benefits, the audit reflects the contributions as an overpayment. *Id.*, ¶¶ 17, 18.

Contributions are used to fund employee benefits which are provided to the eligible employees of an employer. Dkt. 43, Hill Decl., ¶ 19. The Trust Funds provide health and welfare benefits (medical, dental, vision, time-loss, etc.); paid time-off; pension benefits; annuity benefits; and apprenticeship benefits. These benefits are supposed to be only available to employees who meet the Trust Funds' eligibility requirements. *Id.*, ¶ 20. If an employer inappropriately reports an employee and submits contributions on their behalf, the employer can create eligibility for those employees inappropriately reported. *Id.*, ¶ 21. The Trust Funds rely on employers to accurately report their covered employees and their hours worked. *Id.*, ¶ 22.

1    On May 31, 2012, Duane May, Jr., executed an Iron Workers Independent Agreement on

2  behalf of Western (the "Independent Agreement"), by which Western bound itself to the terms

3  and conditions of the Master Labor Agreement between the Northwest Iron Workers Employers

4  Association, Inc. and the Iron Workers District Council of the Pacific Northwest ("MLA"). Dkt.

5  43, Hill Decl., ¶ 23. Western also agreed to be bound by all "modifications, changes, extensions,

6  renewals or successor agreement of the Master Labor Agreement." The current Master Labor

7  Agreement is in effect as of July 1, 2017. *Id.*, ¶ 24.

8    By becoming signatory to the MLA, Western agreed to be bound to the terms of the Trust

9  Agreements governing the Trusts Funds. Dkt. 43, Hill Decl., ¶ 25. Payments to the Trust Funds

10  are to be made by the 15th day of the calendar month following the month in which the

11  contributions were earned. *Id.*, ¶ 26.

12    According to Defendant Betsy May, an employee of Western who manages its daily

13  business and payroll and contributions to the Trust Funds, Western submits monthly remittance

14  reports to the Trusts documenting its employees for each active job, and those employees' hours

15  spent on labor which falls under the scope of the MLA. Dkt. 45, Declaration of Betsy May, ¶ 5.

16  Western makes monthly fringe benefit contributions to the Trust Funds pursuant to the

17  remittance reports. *Id.*, ¶ 6. After receiving and reviewing the remittance reports, the Trust Funds

18  issue a lien release to the general contractor for the job that Western is working. General

19  contractors do not pay Western unless and until they have received a lien release from the Trust

20  Funds. *Id.*, ¶ 7.  This dynamic has led to numerous disputes between Western and the Trust

21  Funds over the years. Western contends the Trust Funds have interfered with and damaged

22  Western's relationships with general contractors, and has at times stopped Western's cash flow,

23  which has made it difficult or even impossible for Western to pay employees and make trust

contributions. *Id.*, ¶ 8. In April 2020, Western served formal notice to the Trust Funds that it was terminating its participation under the MLA. *Id.*, ¶ 9, Exhibit A.

Western contends that its required contributions apply only to Western employees whose scope of work falls under the MLA. The full jurisdictional clause of the MLA can be found at Dkt. 43, Hill Decl., Exhibit B (MLA), pp. 11-14.[2] The MLA also provides:

> Contributions required under this Agreement are due for compensable hours on any person who performs bargaining unit work covered by this Agreement.

*Id.*, Ex. B, MLA, Section A.9., Subsection I, p. 34.

B.    The Complaint and Audit

On April 3, 2018, Plaintiffs filed their Complaint against Western for unpaid contributions, under sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), and 1145. The Trust Funds allege, among other things, that Western had not complied with the Trust Funds' request for an audit of the company's payroll and related business records ("Audit"). Dkt. No. 1. After the complaint was filed, the parties agreed to delay litigation while an Audit was conducted.

On July 3, 2019, the Ironworkers Trust Funds' auditor released the Random Payroll Audit Program Report (the "Audit Report"). Dkt. 43, Hill Decl., ¶ 27. The Audit Report concluded Western owes contributions in the amount of $92,014.36 for the period June 2016 through July 2018. In addition, as set forth in the Audit Report, Western owes an additional $32,695.65 in liquidated damages, $16,611.91 in interest, $16,006.85 in audit costs for a total due of $157,328.77. *Id.*, ¶ 28

---

[2] CM/ECF numbering.

REPORT AND RECOMMENDATION - 5

The Audit also showed that Western overreported and incorrectly submitted contributions on behalf of some if its employees, in the amount of $26,621.27.29.[3] The Audit results break out the overpayments by fund. With respect to the funds listed as "Health and Security" refund or offset is not available to the Western as the incorrectly paid contributions were used to provide eligibility for health and welfare benefits. Dkt. 43, Hill Decl., ¶ 30. With respect to vacation funds and PTO, these are employee-side contributions withheld from employees' paychecks which are deposited to an account on their behalf. The Trust Funds do not have possession of these funds and they are not eligible for refund or offset. *Id.*, ¶ 31. Health contributions and vacation/PTO contributions accounts for $23,308.66 of the overreported and incorrectly submitted contributions. *Id.*, ¶ 32.

Refund of the Pension, Annuity and Apprentice funds is governed by ERISA § 401(a)(2) and the regulation interpreting this section, 26 CFR § 1.401(a)(2)-1. The statute provides the Boards of Trustees discretion to approve a request for refund. Provided a refund is approved, the Trust Funds must perform an employee-by-employee analysis because an offset/refund is not available if the participant has already retired or withdrawn benefits. *Id.*, ¶ 33.

C.    Western's Amended Counterclaim (Dkt. 41)

Western asserts one counterclaim – that it is entitled to reimbursement or restitution of the incorrect contributions that it submitted to the Trust Funds. Dkt. 41. Western alleges the Trust Funds are entitled to trust contributions only for those Western employees whose labor falls within the scope of work set forth in the MLA and the Audit showed that Western had overpaid that amount to the Trust Funds. Dkt. 41, ¶ 11, Exhibit B.

---

[3] The documents attached to the Amended Counterclaim confirm an Audit finding of this overpayment but provide no further explanation other than reflecting undefined "Hours Exceptions" and "Contribution Exceptions."

1    After a review of the Audit and its payment and employee records, Western identified

2    $18,271.48 in mistakenly made contributions for the year 2017. *Id.*, ¶ 24, Exhibit C. Western

3    alleges that these contributions should not have been made because the work these employees

4    were engaged in was outside the scope of the work of the MLA (such as concrete installation,

5    loading and unloading, travel, formwork installation, and offsite rebar fabrication in Western's

6    yard) and that Western failed to first examine the nature of the employees' tasks before sending

7    the contributions to the Trust Funds. *Id.*, ¶¶ 14, 16; Exhibit C.

8    According to the Amended Counterclaim, the Trust Funds have been on notice of

9    Western's overpayment since at least July 3, 2019, the date of the Audit. *Id.*, ¶ 21, Exhibit B,

10   Schedule A-2. However, the Trust Funds have declined to issue an overpayment reimbursement

11   to Western and have not yet informed whether the Trust Funds have determined that an

12   overpayment was mistakenly made, pursuant to Section 303(c)(2)(A)(ii). *Id.*, ¶¶ 22, 23.

13   Western alleges that the principles of equity demand that it be reimbursed because the

14   overpayment was first identified by the Audit; it is being asked to pay contributions for

15   employee labor that falls outside the scope of the MLA; and, equity does not favor allowing the

16   Trust Funds to withhold a payment it should not have received or to collect an underpayment that

17   is not due while depriving Western of significant funds. *Id*., ¶ 26.

18                                    STANDARD OF REVIEW

19   Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim

20   upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is

21   appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a

22   cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th

23   Cir.1990). A motion to dismiss a counterclaim brought pursuant to Federal Rule of Civil

1    Procedure 12(b)(6) is evaluated under the same standard as a motion to dismiss a plaintiff's

2    complaint. *See*, *e.g.*, *Boon Rawd Trading Inter'l v. Paleewong Trading Co.*, 688 F.Supp.2d 940,

3    947 (N.D.Cal.2010).

4        To sufficiently state a claim to relief and survive a Rule 12(b) (6) motion, a complaint

5    "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise

6    a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127

7    S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his

8    'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

9    the elements of a cause of action will not do." *Id.* (quoting Fed.R.Civ.P. 8(a)(2)).

10        "Generally, the scope of review on a motion to dismiss for failure to state a claim is

11    limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

12    However, the Court may utilize "attached exhibits, documents incorporated by reference, and

13    matters properly subject to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051

14    (9th Cir. 2014). Here, the MLA and Audit are incorporated by reference in Western's

15    counterclaim, they are central to Western's claim, and no party questions their authenticity.

16    *Viggiano v. Hansen Natural Corp.*, 944 F. Supp. 2d 877, 882 (C.D. Cal. 2013) (citing *Marder*,

17    450 F.3d at 448).

<u>DISCUSSION</u>

19        ERISA § 403(c)(2)(A), 29 USC 1103(c)(2)(A), and its regulations found at 26 CFR §

20    1.401(a)(2)-1 govern the standard for when a refund can be issued to an employer. ERISA §

21    403(c)(2)(A) provides that with respect to multiemployer plans, a plan is not prohibited from

22    refunding those amounts within six months after determining the contributions were made as a

23    result of a mistake of fact or law. ERISA § 403(c)(2)(A). The Ninth Circuit explained that

REPORT AND RECOMMENDATION - 8

1    Section 403(c)(2)(a) of ERISA is an exception to the general rule prohibiting assets from inuring

2    to the benefit of employers:

3        If pension contributions were refundable under any set of circumstances other
         than those specifically enumerated in section 403(c)(2), their refund would violate
4        section 403(c)(1). To curb abuse in the use of pension assets, Congress intended
         to limit the availability of refunds to just those situations described in section
5        403(c)(2).

6    *Award Service*, 763 F.2d at 1070-1071.

7        The regulation interpreting Section 403(c)(2)(A), further provides that an employer must

8    establish the right to a refund of the amount mistakenly contributed by filing a claim with the

9    plan. It states the "employer making the contribution or withdrawal liability payment to a

10   multiemployer plan must demonstrate that an excessive contribution or overpayment has been

11   made due to a mistake of fact of law." *See* 26 CFR 1.401(a)(2)-1(b)(2)(i). The Board of Trustees

12   of each of the Trust Funds has discretion to determine whether to refund the contributions

13   overpaid to that Trust Fund. The statute and regulations do not require the Boards of Trustees to

14   refund the contributions, and in certain circumstances, prohibits refund. *Id.*

15       In the Ninth Circuit, an employer has an implied right of action under Section 403 to

16   recover mistaken contributions. *British Motor Car Distrib., Ltd. v. San Francisco Auto. Indus.*

17   *Welfare*, 882 F.2d 371, 374 (9th Cir.1989) (citing *Award Serv., Inc. v. Northern Cal. Retail*

18   *Clerks Unions*, 763 F.2d 1066, 1068 (9th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 850,

19   88 L.Ed.2d 890 (1986)) (stating that section 403 confers no right to refund expressly; "it merely

20   permits the return of contributions mistakenly paid"). However, a showing of mistake of fact will

21   not automatically result in a refund to the employer. After demonstrating that contributions

22   resulted from a mistake, the employer must also establish that the equities favor restitution.

23   *Award Serv.*, 763 F.2d at 1069.

REPORT AND RECOMMENDATION - 9

The Trust Funds do not dispute that Western has now alleged in its Amended Counterclaim that "it mistakenly submitted contributions to the Trust Funds…". Dkt. 42, pp. 6, 18. The Trust Funds argue that Western's Amended Counterclaim should be dismissed because (1) there is no refund available for the bulk of the overpayments; (2) Western has not alleged that equity favors refund of the mistaken contributions; and (3) in any event, Western is not entitled to a refund for compensable hours worked by Ironworkers.

       1.    <u>Unavailability of Refund/Offset</u>

Of the $26,621.27 claimed by Western as having been mistakenly paid, the Trust Funds state that no refund is available for $23,308.66 of the mistaken payments. For funds listed in the Audit as "Health and Security," a refund or offset is not available to Western as the incorrectly paid contributions were used to provide eligibility for health and welfare benefits. Dkt. 43, Hill Decl., ¶ 28. For funds listed as "Vacation" and "PTO", a refund or offset is not available because the Trust Funds do not have possession of these funds, which are employee-side contributions withheld from employees' paychecks and deposited to an account on their behalf. *Id*., ¶ 29.

Western makes no response to this contention, stating only that The Trusts "do not dispute that at least a portion of the alleged overpayments are contributions that Trusts control or controlled." Dkt. 44 at 13.

At the motion to dismiss stage, the Court addresses only whether the Amended Counterclaim (and documents properly incorporated by reference or subject to judicial notice), sufficiently states facts to support the claim that Western mistakenly submitted contributions to the Trust Funds. Whether Western's claim for mistaken overpayments is ultimately determined

1    to be $26,621.27 or $3,312.61, the parties agree that Western has sufficiently stated facts to

2    support its claim that payments were mistakenly made.[4]

3        2.    Failure to Allege Equities

4        An employer must establish that the equities favor restitution. *British Motor Car*, 882

5    F.2d at 374.  In its Amended Counterclaim, Western alleges that the principles of equity demand

6    that it be reimbursed because the overpayment was first identified by the Audit; it is being asked

7    to pay contributions for employee labor that falls outside the scope of the MLA; and, that equity

8    does not favor allowing the Trust Funds to withhold a payment it should not have received or to

9    collect an underpayment that is not due while depriving Western of significant funds. *Id*., ¶ 26.

10        If, as alleged by Western, the Trust Funds have "neither paid any benefits nor risked

11   paying any" (assuming it is ultimately determined that Western is entitled to a refund of at least a

12   portion of the amount claimed), then it would be inequitable for the Trust Funds "to keep the

13   mistakenly made contributions merely because other funds paid out benefits." *See Laborers'*

14   *Health and Welfare Fund for Southern California v. W.A. Rasic Constr. Co., Inc.*, 145 F.3d

15   1338, *2 (9th Cir. 1998).

16        In its response to the motion to dismiss, Western also argues that the equities favor its

17   claim as the stability of the Trust Funds will not be undermined if they are directed to reimburse

18   Western. Dkt. 44, pp. 12-13. Financial impact on the Funds of a refund should be considered in a

19   balancing of the equities as "[a] principal equitable consideration is whether restitution would

20   undermine the financial stability of the plan." *Award Serv.*, 763 F.2d at 1068; *see also Chase v.*

21

22   [4] The Trust Funds also argue that Western did not timely seek restitution (within six months after
     determining the contributions were made as a result of a mistake of fact), but Western alleges in
23   its Amended Counterclaim that the overpayments were discovered during the Audit, which was
     performed after the parties were engaged in litigation, and that it "raised the issue of its
     contribution overpayments on several occasions in the past with Plaintiff…". Dkt. 41, p. 4.

*Trustees of Western Conference of Teamsters Pension Trust Fund*, 753 F.2d 744, 753 (9th Cir.1985). Conversely, the effect on beneficiaries may also be considered. *See Laborer's Health*, at *2 ("If employers are allowed to recover overpayments and thereby reduce a fund's total assets, those who have retired will have received too much because their benefits were calculated as a share of an inflated calculation of total assets.") (citing *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund*, 976 F.2d 834, 836 (2d Cir.1992)).

Thus, Western has sufficiently plead that equity favors restitution for any mistakenly made payments to the Trust Funds. However, there remains the question of whether Western's claim for reimbursement is based on a legally sufficient claim.  In other words, whether the "non-conclusory 'factual content,' and reasonable inferences from that content," are "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3.    Compensable Hours and the MLA

Western alleges that it independently investigated the $26,621.27 overpayment identified in the Audit and concluded that the overpayments include contributions mistakenly made for employees whose labor hours fell outside the scope of the MLA. For example, for the year 2017, Western found mistaken contributions of $18,271.48 for employees "engaged in a variety of non-MLA-covered tasks, including concrete installation, loading and unloading, travel, formwork installation, and offsite rebar fabrication in Western's yard." Dkt. 41, ¶¶ 4-15; Exhibit C; Dkt. 45, May Decl., ¶ 16.[5]

---

[5] The Amended Complaint refers to the year 2017 for the $18,271.48 in overpayments, while Ms. May's declaration refers to the year 2018. This discrepancy is not material to the instant motion.

Western bases its determination of what labor falls outside the scope of the MLA on the following definition contained in the MLA: "all work in connection with field fabrication and/or erection of structural, ornamental and reinforcing steel work coming within the jurisdiction of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers recognized by the Building and Construction Trades Department of the American Federation of Labor - Congress of Industrial Organizations." Dkt. 44, p. 5 (*citing* Dkt. 43, Ex. B, p. 11).

As previously noted, the full jurisdictional clause of the MLA can be found at Dkt. 43, Hill Decl., Exhibit B (MLA), pp. 11-14. The clause describes in detail the job classifications of Ironworkers and all work engaged in by Ironworkers. The MLA also provides that "[c]ontributions required under this Agreement are due for compensable hours on any person who performs bargaining unit work covered by this Agreement." *Id.*, MLA Section A.9., subsection I, p. 34. The Trust Funds argue that Western's Amended Complaint is legally deficient if the only basis for the claimed refund is that some of their bargaining unit employees performed some non-bargaining unit work. Dkt. 47, pp. 6-7.

The Ninth Circuit has long adhered to the rule that when an employee splits his working time between a position covered by a collective bargaining agreement and a non-covered position, the employer must contribute for all hours the employee works or is paid. *Board of Trustees of Cement Masons and Plasterers Health and Welfare Trust,* 64 Fed.Appx. 39, * 1 (9th Cir. 2003) (citing *Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc*., 911 F.2d 1347, 1351 (9th Cir.1990) (applying split-time rule requiring pension contributions for employees performing both covered and non-covered work); *Operating Eng'rs Pension Trust v. A–C Co*., 859 F.2d 1336, 1341 (9th Cir.1988) (same); *Kemmis v. McGolderick*, 706 F.2d 993 (9th Cir.1983) (applying split-time rule in favor of salaried employee who split work time between

covered and non-covered work). The split-time rule has been applied in a variety of contexts and "[t]he overriding federal policy is best effectuated if collective bargaining agreements are interpreted and enforced in a uniform manner." *Kemmis*, 706 F.2d at 997 (internal quotation marks omitted).

If an employee has performed work covered by the collective bargaining agreement, the court conducts a two-step inquiry. *See B & E Backhoe*, 911 F.2d 1347, 1351 (9th Cir.1990). First, the court begins with the presumption that the employee worked forty hours per week. If the employer is able to rebut that presumption, then it need only contribute for the actual hours the employee worked. *Id.* at 1352. If the presumption is not overcome, then the court applies the conclusive presumption that the employee spent forty hours on covered work, even though the employee may in fact have spent part of his or her time on non-covered work. *Id.*

As this is an evidentiary presumption (not a pleading requirement), which will require Western to provide proof to support its theory of mistaken overpayments, this issue is more appropriate at the summary judgment stage and the Court need not reach it at this time.

In summary, the undersigned concludes that Western has alleged facts sufficient to state a claim under Section 403 for recovery of the alleged mistaken contributions. Accordingly, it is recommended that the Trust Funds' motion to dismiss (Dkt. 42) be **denied**.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **Tuesday, October 13, 2020.** The Clerk should note the matter for **Thursday, October 15, 2020**, as ready

for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed seven (7) pages. The failure to timely object may affect the right to appeal.

DATED this 25th day of September, 2020.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 15