1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

14

15

16

17

BOARDS OF TRUSTEES OF THE
NORTHWEST IRONWORKERS HEALTH
AND SECURITY FUND, NORTHWEST
IRONWORKERS RETIREMENT TRUST,
NORTHWEST FIELD IRONWORKERS
ANNUITY TRUST FUND, NORTHWEST
IRONWORKERS EMPLOYERS
VACATION TRUST, NORTHWEST
IRONWORKERS & EMPLOYERS
APPRENTICESHIP & TRAINING TRUST
FUND,

                    Plaintiffs,

        v.

WESTERN REBAR CONSULTING, INC.
d/b/a WESTERN INDUSTRIES, INC., and
DUANE MAY JR. and BETSY MAY, and
the martial community jointly and severally,

                    Defendants.

CASE NO. 2:18-cv-00486-RAJ-BAT

**REPORT AND
RECOMMENDATION**

18

19

20

21

22

23

        Plaintiffs Boards of Trustees of the Northwest Ironworkers Health and Security Fund,

Northwest Ironworkers Retirement Trust, Northwest Field Ironworkers Annuity Trust Fund,

Northwest Ironworkers Employers Vacation Trust, Northwest Ironworkers & Employers

Apprenticeship & Training Trust Fund ("Ironworkers Trust Funds") filed this action against

Defendant Western Rebar Consulting, Inc. d/b/a Western Industries, Inc., ("Western") and

jointly and severally against Defendants Duane May Jr. and Betsy May (the "Mays"), and their

REPORT AND RECOMMENDATION - 1

marital community, for unpaid contributions pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq*. ("ERISA"), and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5). Dkt. 1.

Ironworkers Trust Funds seek summary judgment against Western for delinquent contributions of $92,014.36 (minus $3,312.62 identified as overpayments), liquidated damages of $32,695.55, interest of $160,117.66,[1] accounting fees of $16,006.85, and attorney fees and litigation costs if it prevails on this motion for summary judgment. Dkt. 1, p. 8.

Ironworkers Trust Funds also seek entry of summary judgment jointly and severally against the Mays and their marital community, for a portion of the delinquent contributions withheld from employee paychecks and not remitted to the Ironworkers Trust Funds in the amount of $4,264.23 in vacation/PTO contributions, $750.00 in liquidated damages and $316.95 in interest. *Id.*

Western acknowledges its obligations to make contributions for "work covered by the MLA" (Dkt. 55, p. 3), but seeks summary judgment on its counterclaim for reimbursement or restitution of incorrect contributions submitted to Ironworkers Trust Funds. Dkt. 41. Western alleges it is obligated to make contributions only for employees who are union members whose labor falls within the scope of work set forth in the Master Labor Agreement ("MLA"). Dkt. 41, ¶ 11, Ex. B.

The undersigned finds there are no questions of material fact and recommends that the Court grant Ironworkers Trust Funds' motion for summary judgment and deny Western's cross-motion for summary judgment.

---

[1] Updated through May 15, 2021. Dkt. 53, Declaration of Jose Rodriguez, ¶ 12.

REPORT AND RECOMMENDATION - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

<u>BACKGROUND</u>

A.     <u>Background of the Ironworkers Trust Funds</u>

Ironworkers Trust Funds are multiemployer, collectively bargained, employee benefit plans regulated by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq*. ("ERISA"), and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5). In accordance with the LMRA, Ironworkers Trust Funds are administered by joint labor-management Boards of Trustees, half of whom are appointed by Northwest Ironworkers District Council and half of whom are appointed by the participating employers who negotiate with the District Council. All Trustees serve without compensation. Dkt. 54, Declaration of Karen Bayne, ¶¶ 2-3.

Ironworkers Trust Funds are administered by a third-party administrator, Welfare and Pension Administration Services, Inc. ("WPAS"). WPAS's responsibilities include, but are not limited to, maintaining records on behalf of the Trust Funds, administering benefits, and responding to participants. Of relevance to this case, WPAS is responsible for maintaining copies of the Trust Agreements, signatory employers' Independent Agreements, or other agreements to be bound, Master Labor Agreements, employer remittance reports, employer payroll audits, the contributions reported and the contributions paid to Ironworkers Trust Funds. *Id.*, ¶¶ 4-5.

Ironworkers Trust Funds are primarily funded by employer contributions. Dkt. 54, Bayne Decl., ¶ 6. Depending on the fund, employees may have wages withheld and submitted as contributions (*e.g.* employee contributions to a vacation or 401k fund) or the contributions may be funded solely by the employer (*e.g.* pension contributions). *Id.*, ¶ 7. An employer's obligation to contribute to the funds arises from a collective bargaining agreement ("CBA"), which is also

1    known as a "Master Labor Agreement" ("MLA"), or other agreement to be bound to a CBA. *Id.*,

2    ¶ 8.[2]

3        Ironworkers Trust Funds are not a party to the CBA. The CBA and federal labor law

4    determine the scope of covered work for which an employer must submit contributions and how

5    (*e.g.*, per hour worked or per hour paid) the employer contributes to trust funds. The

6    contributions are reported to the trust funds by an employer on a per hour paid basis. *Id.*, ¶ 9.

7        Employers are obligated in accordance with the terms of their MLA to submit monthly

8    reports called "remittance reports" to WPAS by the 15th of the month following the month work

9    is performed. The employer completes the remittance report by listing the employees performing

10   covered work, hours worked, and contributions owed to the trust funds. Dkt. 54, Bayne Decl., ¶¶

11   9, 10, Ex. A. Ironworkers Trust Funds rely on employers' remittance reports to provide benefits

12   to the employees. *Id.*, ¶ 11.

13       To confirm that signatory employers are accurately reporting and contributing,

14   Ironworkers Trust Funds perform payroll audits. As part of the payroll audit, an auditor reviews

15   the records of Ironworkers Trust Funds and the employer's records. The auditors confirm

16   whether the employers have contributed on all covered hours on behalf of all employees

17   performing covered work, not just union members. Auditors also confirm whether the employer

18   is correctly reporting the hours worked and not reporting ineligible individuals or hours that

19   should not be reported. Dkt. 54, Bayne Decl., ¶ 12.

20       Ironworkers Trust Funds use the contributions paid by employers to fund employee

21   benefits provided to eligible employees such as health and welfare benefits (medical, dental,

22

23   _____

[2] If the Trust Agreement provides that the Trustees may offer other agreements to be bound, *i.e.*, Associate Agreements, employers can also contribute on behalf of non-bargained employees. Commonly, these are office workers or others not performing work covered by a CBA.

1    vision, paid time off, time-loss, etc.); pension benefits; annuity benefits; and apprenticeship

2    benefits. These benefits are generally only available to employees who meet Ironworkers Trust

3    Funds eligibility requirements; however, if an employer reports and submits health, vacation, or

4    PTO hours and contributions on behalf of its employees, Ironworkers Trust Funds may provide

5    eligibility and benefits before learning that an employee is not technically eligible for those

6    benefits. Dkt. 54, Bayne Decl., ¶ 13.

7    B.    Western's Contribution Obligation

8          On May 31, 2012, Duane May Jr. executed an Iron Workers Independent Agreement on

9    behalf of Western Rebar (the "Independent Agreement"). Dkt. 54, Bayne Decl., ¶ 14. By signing

10   the Independent Agreement, Western bound itself to the terms and conditions of the MLA

11   between the Northwest Iron Workers Employers Association, Inc., and the Iron Workers District

12   Council of the Pacific Northwest. The last MLA that Western was bound to was effective

13   between July 1, 2017 through June 30, 2020. Dkt. 28, p.11-47.

14         By becoming signatory to the Independent Agreement and MLA, Western agreed to be

15   bound to the terms of the Trust Agreements governing the Ironworkers Trust Funds (*i.e.*, Health

16   and Security, Pension, Vacation/Paid Time Off, Annuity) and to make monthly contributions to

17   the funds, as well as additional funds specified by the MLA (*i.e.*, union dues and ancillary

18   funds). *See* Dkt. 28, Declaration of Michelle Hill, pp. 30-34 (MLA, Article 9, Section A).

19   C.    Ironworkers Trust Funds' Complaint

20         On April 3, 2018, Ironworkers Trust Funds filed their Complaint alleging among other

21   things, that Western had breached the provisions of its CBA and the incorporated Trust

22   Agreements by failing to submit its remittance reports and payments for the delinquent months

23   of April through November 2017. After filing the Complaint, Ironworkers Trust Funds requested

1   an audit of the company's payroll and related business records for June 2016 through June 2018.

2   Western complied with the audit request.[3]

3        On July 3, 2019, Ironworkers Trust Funds' auditor released an updated Random Fringe

4   Benefit Contributions Compliance Report (the "Audit Report"). The Audit Report concluded

5   Western underreported and/or underpaid $92,014.36 in fringe benefit contributions for the period

6   June 1, 2016 through June 30, 2018. Dkt. 53, Rodriguez Decl., ¶¶ 5-6; Dkt. 54, Bayne Decl., ¶¶

7   16-17. As set forth in the Audit Report, Western also owes $32,695.55 in liquidated damages,

8   interest charges of $60,117.66 (updated through May 15, 2021), plus $16,006.85 in accounting

9   fees for a total due of $200,834.42. Dkt. 53, Rodriquez Decl., ¶¶ 12, 5-6; Dkt. 54 Bayne Decl., ¶¶

10  16-17.

11       The Audit Report also showed that Western overreported and incorrectly submitted

12  contributions on behalf of its employees in the amount of $26,612.27. Dkt. 54, Bayne Decl., ¶16;

13  *see* Dkt. 28, Ex. C; Dkt. 53, Rodriguez Decl., ¶9. The Audit Report identifies the overpayments

14  by fund: (1) "Health and Security" (2) "Vacation and PTO" and "Pension, Annuity and

15  Apprenticeship." Dkt. 54, Bayne Decl., ¶¶ 17-21.

16       Ironworkers Trust Fund contends that Western is only entitled to a refund or offset of

17  $3,312.61 for overpayments made to the Pension, Annuity and Apprenticeship Funds and that

18  the balance of $23,208.66 for overpayments made to the Health and Security and Vacation and

19  PTO Funds are ineligible for offset or reimbursement. *Id.*, ¶ 21

20       Western acknowledges that it is liable for unpaid contributions of $9,943.29. However, it

21  contends that it is entitled to a credit for all overpaid contributions identified in the Audit

22

23  [3] All amounts claimed by Ironworkers Trust Funds are derived from Western's payroll Audit
    Report covering the period June 2016 to June 2018. Dkt. 52, p. 22; Dkt. 53, Rodriguez Decl., ¶
    8; Dkt. 59, Second Rodriguez Decl.; Exhibits A-N.

REPORT AND RECOMMENDATION - 6

1   ($26,617.27), and therefore, is due a credit of $16,673.98. Dkt. 56, Declaration of Betsy May, ¶

2   16; Ex. 1.

3          As to the remainder of the unpaid contributions identified in the Audit ($82,070.97),

4   Western contends it does not owe these amounts because the worker was either not a union

5   member or the worker was performing non-covered work at specific times. Dkt. 62, Second

6   Declaration of Betsy May. Western requested revision of the July 2019 Audit Report based on its

7   contention that several of its employees performed non-covered work as well as Ironworker

8   work. Dkt. 59, ¶ 4. The auditor rejected the proposed revisions that were based on Western's

9   theory of how the split-rule should be applied. *Id.*

10  D.    Western's Amended Counterclaim (Dkt. 41)

11         Western also asserts it is entitled to reimbursement or restitution of $18,271.48 in

12  "mistakenly" made contributions for 2017. Dkt. 41, ¶ 11, Exhibits B and C. *Id.*, ¶ 24, Ex. C.

13  Western contends these contributions were incorrectly submitted for work performed by non-

14  union employees or for work performed outside the scope of the MLA. *Id.*, ¶¶ 14, 16; Ex. C.

15         In addition to overpayments for work performed falling outside the scope of the MLA

16  and for work performed by non-union members, Western seeks reimbursement of the $26,621.27

17  identified in the Audit Report as overpayments to the Health and Security, Vacation, and PTO

18  Vacation Funds. *Id.*, ¶ 21, Ex. B, Schedule A-2. Western contends that Ironworkers Trust Funds

19  could not have paid these benefits to non-union members. Dkt. 55, p. 2.

20  E.    Evidentiary Objections

21         Western moves to strike Mr. Rodriguez's second declaration (Dkt. 59) on the grounds

22  that Mr. Rodriguez has no personal knowledge of the specific work performed by each

23

employee. Dkt. 60, p. 2. Western also moves to strike the declaration of Chris McClain (Dkt. 58) on the grounds that it includes improper legal conclusions. *Id.*

The Court denies the motions to strike. Defendants' objections are without merit and are largely duplicative of Rule 56's motion for summary judgment standard. As a court can award summary judgment only when there is no genuine issue of material fact, any statements based on improper legal conclusions or without personal knowledge are therefore, considered by the Court as argument only.

As to the substance of the declarations, Mr. Rodriguez, who is a WPAS Benefits Compliance Specialist, testified to his analysis of Western's payroll records. Dkt. 53, p. 2; Dkt. 59, p. 2. Mr. McClain, who is the Business Manager of Iron Workers Local 86, testified to his familiarity with the MLA and the scope of work within the Ironworkers' jurisdiction. Dkt. 58, p. 2. These witnesses are competent to testify to the facts set forth in their declarations based on personal knowledge acquired through their positions and performance of their job duties.

## LEGAL STANDARDS

A party is entitled to summary judgment if there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. "A material fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982). A party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553 (1986); *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978) (genuine issues are not raised by mere conclusory allegations).

1    Once the moving party meets its initial responsibility, the burden shifts to the non-

2    moving party to establish that a genuine issue as to any material fact exists. *Matsushita Elec.*

3    *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). Evidence

4    submitted by a party opposing summary judgment is presumed valid, and all reasonable

5    inferences that may be drawn from that evidence must be drawn in favor of the non-moving

6    party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). The non-

7    moving party cannot simply rest on its allegation without any significant probative evidence

8    tending to support the complaint. *See U.A. Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465,

9    1471 (9th Cir.1995). "[A] complete failure of proof concerning an essential element of the non-

10   moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

11   ERISA mandates that the Board of Trustees of Ironworkers Trust Funds promptly collect

12   all contributions due and owing. *C. States, S.E. and S.W. Areas Pension Fund v. C. Transport*,

13   *Inc.*, 472 U.S. 559, 572–73 (1985); *see also Operating Engineers Pension Trust v. A-C Co.*, 859

14   F.2d 1336, 1343-1344 (9th Cir. 1988)(trust funds have a statutory and fiduciary duty to collect

15   contributions and failure to pursue legal remedies may be a breach of their obligations).

16   Ironworkers Trust Funds contend that Western failed to pay contributions in accordance

17   with ERISA Section 502(a)(3) and 515 and is responsible for late fees pursuant to the terms of

18   the Trust Agreements and ERISA 502(g)(2). Even if Western disputes the amount claimed by

19   Ironworkers Trust Funds, simply disputing the claim is not sufficient to defeat summary

20   judgment. Rather, Western must provide specific evidence to show that Ironworkers Trust Funds

21   is mistaken. *Wattis v. J.R. Simplot Company*, 26 F.3d 885, 890 (9th Cir. 1994). Western cannot

22   rely on mere allegations contained its answer (or other pleadings). *T.W. Electrical Service, Inc. v.*

23   *Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

1

DISCUSSION

2    The Audit Report identified both an underpayment ($92,014.36) and overpayment

3    ($26,621.27) of contributions. Dkt. 54, Bayne Decl., ¶¶ 17-18; Dkt. 43, Declaration of Michelle

4    Hill, pp. 51 and 65, respectively. It is undisputed that the overpayment of $26,621.27 occurred as

5    the result of clerical errors when Western overreported hours worked. However, the parties

6    dispute whether Western is entitled to a credit for the entire overpayment.

7    Next, Western claims that of the $92,014.36 identified in the Audit Report as

8    underpayments, only $9,943.29 owed by Western. Western contends that it does not owe the

9    remaining $82,070.97 because these amounts were mistakenly attributed to non-union employees

10    or employees who performed outside the scope of the MLA.

11    Western further asserts that it is entitled to reimbursement or restitution of $18,271.48 in

12    "mistakenly" made contributions for the year 2017. Dkt. 41, ¶¶ 11, 24; Ex. B; Ex. C. Here again,

13    Western contends that these amounts were mistakenly submitted for work performed by non-

14    union employees and/or by union employees who were engaged in work outside the scope of the

15    MLA.

16    A.    Overpayment of Contributions Based on Clerical Errors

17    Western seeks recovery of the entire amount of $26,621.27 identified in the Audit Report

18    as overpayments based on clerical errors. Dkt. 41. The Audit Report identifies the overpayments

19    by fund: (1) "Health and Security"; (2) "Vacation and PTO"; and (3) "Pension, Annuity and

20    Apprenticeship". Dkt. 54, Bayne Decl., ¶¶ 17-21.

21    Ironworkers Trust Funds contends that Western is only entitled to a credit of $3,312.62 as

22    the remaining funds were already used for benefits or are no longer in their possession.

23

REPORT AND RECOMMENDATION - 10

1    ERISA § 401(a)(2) provides that with respect to multiemployer plans, a plan is not

2    prohibited from refunding contributions within six months after determining the contributions

3    were made as the result of a mistake of fact or law. ERISA § 401(a)(2). An employer must

4    establish the right to a refund of the amount mistakenly contributed by filing a claim with the

5    plan and must demonstrate that an excessive contribution or overpayment has been made due to

6    a mistake of fact of law." *See* 26 CFR 1.401(a)(2)-1(b)(2)(i). "To curb abuse in the use of

7    pension assets, Congress intended to limit the availability of refunds to just those situations

8    described in section 403(c)(2)." *Award Serv., Inc. v. N. California Retail Clerks Unions and*

9    *Food Employers Jt. Pension Tr. Fund*, 763 F.2d 1066, 1070–71 (9th Cir. 1985). In addition to

10   establishing that the improper contributions were made based on a mistake of fact or law, the

11   employer must also establish that the equities also favor restitution. *British Motor Car*

12   *Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371, 374 (9th

13   Cir. 1989).

14   In determining whether a contribution was the result of a mistake of fact or law, the union

15   status of an employee is not relevant. *See* Section 8(a)(3) of the National Labor Relations Act

16   ("NLRA"), 29 U.S.C. § 158(a)(3), *see also Byrnes v. DeBolt Transfer, Inc*., 741 F.2d 620, 624

17   (3d Cir.1984) ("The absence of any distinction in the agreements between union and non-union

18   members can be easily explained: the law does not permit such a distinction."). The Trust

19   Agreements incorporate these requirements. For example, the Health Trust defines "Employee"

20   as "any employee of an individual employer who performs work of a type covered by the

21   collective bargaining agreement…." Dkt. 54, Trust Agreement Northwest Ironworkers Health

22   and Security Fund, pg. 31, Article 1, Section 3(a). *See also* nearly identical definitions: Annuity

23

Trust Agreement (Dkt. 54, p. 76); Apprenticeship Trust Agreement (Dkt. 54, p. 122); Retirement

Trust Agreement (Dkt. 54, p. 156).[4]

       1.    <u>Health and Security/Vacation and PTO</u>

      The evidence reflects that the overpayments to the Health and Security Fund are not

eligible for refund because these funds are used to provide health and welfare eligibility to

Western's employees. Dkt. 54, Bayne Decl. ¶19. Because Western reported and paid

contributions on behalf of employees for which it is seeking refund of contributions, Ironworkers

Trust Funds contend it is likely that health and welfare benefits were provided. However,

because the Health Trust's Health Plan is a Covered Entity (45 CFR 160.103), as defined by the

Health Insurance Portability and Accountability Act (HIPAA), the Health Trust cannot disclose

whether it actually provided benefits to specific employees as it is a prohibited disclosure of

protected health information ("PHI"). 45 CFR 164.502(a)(1).

      Similarly, with respect to Vacation Funds or PTO, these are employee-side contributions

withheld from employees' paychecks which are then deposited to accounts on their behalf.

Because Ironworkers Trust Funds do not have possession of these funds (Dkt. 54, Bayne Decl.,

¶¶19-21), they cannot refund these amounts. To the extent Western also seeks refund of union

dues, Ironworkers Trust Funds explains that it does not have possession of these funds because

union dues are not employer-side contributions to a trust fund, but rather, are paid by the

employees through wage deductions. Dkt. 52, p. 18.

---

[4] Ironworkers Trust Funds also provide benefits to Associate Employees, who are by trust definition, and often statutorily, excluded from a bargaining unit. Dkt. 54, Trust Agreement Northwest Ironworkers Health and Security Fund, p. 31, Article 1, Section 3(b); Associate Employees include management and other non-bargaining unit individuals. See also Annuity Trust Agreement (Dkt. 54, pp. 76-77); Apprenticeship Trust Agreement (Dkt. 54, pp. 122-123); Retirement Trust Agreement (pp. 156-157).

REPORT AND RECOMMENDATION - 12

2cd7aab1b8b5a40f

In sum, the evidence reflects that the Ironworkers Trust Funds cannot refund or offset contributions that have already been used to provide benefits or that are not in its possession. Western provides no competent summary judgment evidence to the contrary. Accordingly, the Court concludes that the equities do not favor restitution of these amounts.

2.    Pension, Annuity and Apprenticeship

The Audit Report reflects that Western overpaid the amount of $3,312.61 when Western incorrectly reported the number of hours worked by its employees. *See e.g.*, Dkt. 57, p. 8. Ironworkers Trust Funds agree to offset the underpaid amounts owed to each fund by $3,312.61. Dkt. 52, p. 15. The Court agrees that the equities permit the refund of $3,312.61 as this amount is the result of clerical error and has not already been used to provide benefits (like the Health Trust) or deposited into the employees' accounts (like the Vacation/PTO funds).

Based on the foregoing, the Court recommends that Western's cross-motion for summary judgment for a refund or offset of the $23,208.66 attributable to the health, welfare, and vacation/PTO funds be denied as the evidence reflects that these funds are not eligible for refund or offset. Western's claim for a refund or offset of the remaining $3,312.61 is moot.

B.    Underpayments

The Audit Report reflects underpayments in the amount of $92,014.36. Western acknowledges that it is liable for $9,943.29 of this amount but not the balance, because "Western disagrees that it should owe contributions [for work] that fall[s] outside of the MLA." Dkt. 56, Declaration of Betsy May, ¶ 16.

The July 2019 Audit Report was amended from a previous audit based on records provided by Western (including those referenced by Western in response to the instant motion). Dkt. 59, Rodriguez Second Decl., ¶ 4. Western sought revision of the unpaid contributions based

1    on its contention that a particular employee was not a union member, or that the employee

2    performed work outside of the MLA during specific times, and/or the auditor failed to identify

3    the worker. *Id.*, ¶ 15, Ex. 1.  The July 2019 Audit did not include the additional revisions for the

4    reasons listed in Mr. Rodriguez's declaration. Dkt. 59, ¶¶ 5–21.

5         In addition, Western asserts in its counterclaim that it is entitled to reimbursement or

6    restitution of $18,271.48 in "mistakenly" made contributions for the year 2017. Dkt. 41, ¶ 11,

7    Exhibits B and C. Here again, Western relies on the proposition that it is only obligated to make

8    contributions "for those Western employees whose labor falls within the [] scope of work set

9    forth in the MLA" and "the majority of the hours set forth in the Audit as an underpayment were

10   for employee hours that fell outside the scope of the MLA." *Id.*, ¶¶ 8, 12. According to Western,

11   these "non-MLA-covered tasks" include "concrete installation, loading and unloading, travel,

12   formwork installation, and offsite rebar fabrication in Western's yard." *Id.*, Exhibit C. Western

13   also alleges that it is not obligated to make contributions to the Trust Funds for hours worked by

14   non-union employees or employees hired by Western "with the intent of having those employees

15   perform tasks other than those covered under the scope of the MLA" … "even if [the employees]

16   are members of the union." *Id.*, ¶ 15.[5]

17        These claims are not founded on clerical mistakes but on Western's position that it is

18   entitled to a refund or offset of any contributions paid on behalf of a non-union employee or

19   when Western directs its Ironworkers to perform other types of work that are not covered by the

20   parties' labor agreement. As previously discussed, a workers' union status is not relevant to an

21   employer's obligation to make contributions as an employee is "any employee of an individual

22

23   [5] Western seeks summary judgment for a credit of $16,673.98 only ($9,943.29 due and owing to
     the Trust for underpayments offset by the $26,621.27 of overpayments identified in the Audit) –
     not for the amount stated in its counterclaim. *See* Dkt. 55.

REPORT AND RECOMMENDATION - 14

1   employer who performs work of a type covered by the collective bargaining agreement….” Dkt.

2   54, Trust Agreement Northwest Ironworkers Health and Security Fund, pg. 31, Article 1, Section

3   3(a).

4            As to the second contention – when Western directs its employees to perform other types

5   of work – the Ninth Circuit has “long adhered to the rule that when an employee splits his

6   working time between a position covered by a collective bargaining agreement and a non-

7   covered position, the employer must contribute for *all hours* the employee works or is paid.” *See*

8   *Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc.*, 911 F.2d 1347, 1351 (9th Cir.1990)

9   (applying split-time rule requiring pension contributions for employees performing both covered

10  and non-covered work) (emphasis added); *Operating Eng'rs Pension Trust v. A–C Co*., 859 F.2d

11  1336, 1341 (9th Cir.1988) (same); *Kemmis v. McGolderick*, 706 F.2d 993 (9th Cir.1983)

12  (applying split-time rule in favor of salaried employee who split work time between covered and

13  non-covered work). The policy behind the split-time rule is to “minimize the employers' ability

14  to manipulate accounting records to make it appear that employees were not performing [MLA]

15  work.” *B & E Backhoe*, 911 F.2d at 1354; *A–C Company*, 859 F.2d at 1342. Moreover, it would

16  place an “undue burden on most trust funds to require them to perform the investigatory

17  accounting work necessary to ensure the accuracy of employer contributions where employers

18  purport to split their employees' time between bargaining unit and non-bargaining unit work.”

19  *Id.*

20           As noted by Western, the Court previously referred to the split-time rule. *See* Dkt. 48, p.

21  14. At that time, the Court denied Ironworkers Trust Funds' motion to dismiss Western's

22  counterclaim so that Western could support its theory of mistaken overpayments with evidence –

23  an issue not appropriately decided on a motion to dismiss. *Id*. Western now argues that it has

REPORT AND RECOMMENDATION - 15

1    provided this evidence and that the first inquiry the Court must make in determining whether the

2    split-time presumption should be conclusively applied to its employees' work is "whether the

3    employee is a member of the union related to the Trust." Dkt. 55, p. 6. This is incorrect as a

4    matter of law.

5           The split-time rebuttable presumption and two-step inquiry do not hinge on union

6    membership but rather on whether a salaried or non-hourly employee has worked fulltime. *See*,

7    *e.g.*, *Operating Engineers Pension Trusts v. B & E Backhoe, Inc*., 911 F.2d 1347, 1351-52 (9th

8    Cir. 1990) (and cases cited therein). Although the cases in which the rule was developed

9    generally involved salaried employees, an employer's duty to pay trust fund contributions for

10   each hour the employee works or is paid is not altered by the method in which he pays his

11   employees. *See B & E Backhoe*, 911 F.2d at 1351–52. Because the contributions are calculated

12   on a per hour basis, the unique concern with salaried employees is how to determine the number

13   of hours an employee actually worked. *Id*. at 1350. In response to this problem, the Ninth Circuit

14   developed a rebuttable presumption that salaried employees work forty hours per week. *Sapper

15   v. Lenco Blade, Inc*., 704 F.2d 1069, 1072 (9th Cir.1983).

16          To determine whether the employer must contribute to the trust fund based upon a

17   minimum of forty hours a week, a court must conduct a two-step inquiry. First, it must consider

18   whether the employee worked forty hours a week. At this stage in the inquiry, there exists a

19   rebuttable presumption that a salaried or non-hourly employee has worked full time. If the

20   employer successfully rebuts this presumption, he need only contribute for the actual hours the

21   employee worked. If the presumption is not overcome, the court proceeds to step two of its

22   inquiry. At this stage there is nothing the employer can do to escape contributing for forty hours

23   per week. This is because an employee who worked a minimum of 40 hours per week is

REPORT AND RECOMMENDATION - 16

1  conclusively presumed to have worked for forty hours performing MLA work, even though the

2  employee may in fact have spent part of his time performing non-MLA tasks. *B & E Backhoe*,

3  911 F.2d at 1352 (citing *A-C Company*, 859 F.2d at 1340-1341)).

4       In contrast to the forty hour presumption, which may be rebutted upon a showing of

5  actual hours worked, an employer cannot escape its duty to contribute to the trust funds for each

6  and every hour worked or paid by showing that some of a split-time employee's hours were

7  spent performing non-covered work. If the employee performs some work covered by the MLA,

8  the employer must contribute to the trust funds for *all* hours the employee works or is paid. *See*,

9  *e.g.*, *B & E Backhoe*, 911 F.2d at 1351; *A–C Company*, 859 F.2d at 1341; *Kemmis v.*

10  *McGoldrick*, 706 F.2d 993, 997 (9th Cir. 1983); *Waggoner v. Dallaire*, 649 F.2d 1362, 1369 (9th

11  Cir. 1981).

12       Thus, Western's evidence that some of its employees are not members of the union

13  and/or spent some of their time performing non-covered work is insufficient to overcome the

14  conclusive presumption that it is obligated to contribute to Ironworkers Trust Funds for all hours

15  the employees worked or for which they were paid. Western's use of its Ironworkers to perform

16  other labor is not a clerical mistake, or mistake of law or fact. Western may choose to use

17  covered employees to perform other work but these employees are entitled to their benefits for

18  all the hours that they work. Ironworkers Trust Funds are "entitled as a matter of law to recover

19  contributions for all hours worked by [employees] during the [time period] in which they were

20  shown to have performed some covered work for [the employer]." *Brick Masons Pension Trust*

21  *v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1339 (9th Cir.1988).

22       The plain language of the MLA supports this conclusion. ERISA section 515, 29 U.S.C.

23  § 1145, reiterates that an employer must make contributions to the Trust Funds in accordance

1   with the terms and conditions of the MLA. The MLA does not limit its coverage to "union

2   members." Rather, it provides that it "covers all work coming under the jurisdiction of the Iron

3   Workers District Council of the Pacific Northwest…". Dkt. 28, Ex. B (MLA), p. 11-14. In

4   addition, the MLA does not limit the contribution obligation to only work encompassed by the

5   Ironworker's jurisdiction. Instead, the MLA states that once an employee performs work covered

6   by the MLA, contributions are owed *for all compensated hours*. For example, each section of the

7   MLA pertaining to contributions to the Trust Funds provide that contributions are owed for all

8   compensable hours:

9           All persons, parties, firms or corporations who are, or may become signatory
10          parties to this Agreement, expressly agree to be bound by the Trust Agreement
            governing the Health Trust, which is incorporated by reference herein, *and shall
            pay monthly in accordance with the Trust Agreement, the sums as indicated in
11          Schedule "A" for all compensable hours under this Agreement*….

12  Dkt 28, MLA, A9, Fringe Benefits, *see* Sections A -H, pp. 30-32 (emphasis added). The MLA

13  further provides that "Contributions required under this Agreement are due for compensable

14  hours *on any person* who performs bargaining unit work covered by this Agreement." Dkt 28,

15  MLA, A9, Section I, p. 34 (emphasis added).

16          Based on the plain language of the MLA and Ninth Circuit law, the relevant questions

17  here are whether Western's employees performed any covered work and whether Western made

18  contributions for their compensated hours.

19          The MLA "cover[s] all work in connection with:

20          … field fabrication and/or erection of structural, ornamental and reinforcing steel,
            including but not limited to the fabrication, erection and construction of all iron
21          and steel, ornamental lead, bronze, brass, copper and aluminum, plastics and
            substitute materials, all handrail, aluminum, steel, glass and plastic, reinforced
22          concrete structures or parts thereof; bridges, viaducts, inclines, dams, docks,
            dredges…and handling of all materials coming under the jurisdictional claims of
23          the Union such as to rail heads, storage, yards, and monitors for metal floor and
            roof deck leading edge work, shall be done by the Iron Workers…All offsite tying

REPORT AND RECOMMENDATION - 18

and assembly of rebar components by automated or manual means for
construction projects shall be considered covered by this agreement …[MLA,
Article 2, Section C]

Thus, the MLA covers all work in connection with the jurisdiction of the Ironworkers,
including, but not limited to preparing forms, handling materials, and unloading materials – as
well as offsite tying and assembly of rebar components. Even if the work performed by
Western's employees was not specifically the traditional jurisdiction of the work performed by
ironworkers, the MLA clearly applies to all work related to the trade.

Western submitted Exhibit C in support of its counterclaim, in which it set forth
"annotated hours reports for employees not covered under the MLA". Dkt. 41, Ex. C. However,
Exhibit C reflects that the employees in question are all Ironworkers; Western's records identify
these employees according to how they are classified as Ironworkers - Journeymen Ironworkers
(identified as "JIW") or the level of Apprentice based on their experience as an Ironworker under
the MLA. See Dkt. 28, p. 37-38 (MLA Article 13). Western's payroll records show these
individuals worked with rebar, installed rebar templates, installed rebar, worked with support
bars, and fabricated rebar. This work is covered by the MLA. *See* Dkt. 59, Rodriguez Decl., ¶¶ 7-
18, Exhibits C-L. Thus, Western's evidence that these employees *also* performed non-bargaining
unit work is not relevant and does not overcome the conclusive presumption that Western must
contribute for all the hours that these employees worked.

Western similarly asserts this argument in support of its claim that it is not liable for all
underpayments identified in the Audit. For example, Western argues that 39 hours were
incorrectly attributed to employee Phillip Galligan because during that time, Mr. Galligan was
hoisting materials and formwork on the concrete portion of Western's subcontract on the SeaTac
Marriott Project, he is not a union member, and he is limited to light duty tasks. *See* Dkt. 32-1

REPORT AND RECOMMENDATION - 19

(3/18/20 Response to Audit Report), p. 3. However, Western's payroll records reflect that Mr. Galligan also performed MLA covered tasks at the SeaTac Marriott Project, including loading and unloading rebar, installing rebar templates, and installing rebar. *See* Dkt. 59, Rodgriquez Decl., Ex. F, p. 2 (CM/ECF Dkt. 59-1, p. 33). Other examples of Western's contention that it is entitled to exclude certain contributions based on the "split time" rule, can be found in Ms. May's Second Declaration. Dkt. 62. For example, Ms. May testified that L. Baker was not an ironworker for all hours he worked. *Id.*, ¶ 8. However, in September 2017, Western began reporting hours for this employee as a Journeyman Ironworker and Mr. Baker performed MLA-covered work such as tying and assembly of rebar components and unloading and installing rebar. Dkt. 59, Second Rodriguez Decl., ¶¶ 7 and 9; Ex. C.

The Court does not find it necessary to discuss each example because Western's contention that it is not obligated to make contributions on behalf of non-union employees or on the basis of the split time rule for work performed by its employees is legally incorrect.[6]

Finally, Western acknowledges that the Audit Report correctly reflects that it failed to fully pay contributions for J. Sayaosa (28.7 hours), T. James (31.5 hours), and R. Carson (60.5 hours). Dkt. 62, May Second Decl., ¶ 15. However, Western contends that these contributions "were later paid, and the Trustee's counsel Noelle Dwarzski signed a lien release in response." *Id.* In support of this payment, Western provides a December 16, 2019 "Joint Check Agreement"

---

[6] Western also contends that the Audit Report incorrectly reflects contributions due for payroll hours that fall outside the time period covered by the Audit (although it does not appear to request a refund for these amounts). For example, Western states that the last four payroll entries for Mr. Mills reflect work performed in July 2018 (Dkt. 59, Ex. J). However, the document reflects that the work was performed between June 25, 2018 and June 27, 2018 and Mr. Mills was paid for the work in June. *Id.* Similarly, for J. Freeman, the last five payroll entries reflect work performed during the month of June, although the paycheck was not issued until July 6, 2018. *Id.*, Ex. L. Therefore, the evidence does not reflect that these hours were incorrectly included in the Audit.

REPORT AND RECOMMENDATION - 20

1    for the "Duportail Bridge Ph 1" in the amount of $181,268.07, which was signed on behalf of the

2    Ironworkers Trust Funds. Dkt. 62, Second May Decl., ¶ 15; Ex. 3. However, this document does

3    not establish that Western paid the contribution shortages on behalf of these employees.

4            The undersigned concludes that Western has failed in its burden to establish that it is

5    entitled to a refund or offset for contributions paid or owed on behalf of its employees who

6    performed both covered and non-covered work. This contention is without merit and not in

7    accord with the terms of the MLA and the split time rule. Western also failed to carry its burden

8    with respect to the Health and Vacation/PTO funds identified in the Audit Report.

9            Accordingly, it is recommended that Western's summary judgment on its counterclaim

10   for mistaken contributions of $18,271.48 be denied and that summary judgment on Ironworkers

11   Trust Funds' claim of $92,014.36 be granted.

12   C.      Joint and Several Liability of Duane May Jr. and Betsy May and the Marital Community

13           The Ironworkers Trust Funds contend that Duane May Jr. and Betsy May (the "Mays"),

14   and their marital community, are personally and jointly and severally liable under ERISA for

15   vacation/ PTO funds withheld from their employees' paychecks and not remitted to the trusts.

16           ERISA confers fiduciary status on a person with respect to a plan if that individual

17   "exercises any discretionary authority or discretionary control respecting management of such a

18   plan or exercises any authority or control respecting management or disposition of its assets." 29

19   U.S.C. §1002(21)(A)(i). Fiduciary status is defined not in terms of formal trusteeship, but in

20   functional terms of control and authority over a plan or its assets. *Mertens v. Hewitt Assocs.*, 508

21   U.S. 248, 262, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993). The Department of Labor defines

22   trust assets under ERISA as including "amounts that a participant has withheld from his wages

23   by an employer, for contribution…" 29 C.F.R. §2510.3-102(a)(1) (2010). However, union dues

1    withheld from employee paychecks are not considered assets of the plan. *Id*. The withheld

2    amounts become trust assets "when such contributions…can be reasonably segregated from the

3    employer's general assets." *Id*.

4        The Audit Report identified $4,264.23 in vacation and PTO contributions withheld from

5    Western's employees' paychecks for the months of June 2016 through June 2018 and not

6    remitted to the Ironworkers Trust Funds. Dkt. 53, Rodriguez Decl., ¶ 8. Vacation/PTO

7    contributions were reasonably able to be segregated from Western's general assets at the time the

8    company submitted its monthly remittance reports, if not before. In their capacities as owners,

9    president, and controller of Western, it is reasonable to conclude that the Mays exercised

10   authority over Western's finances, including payment of fringe benefit contributions to the

11   Ironworkers Trust Funds and that they are therefore, fiduciaries.

12       ERISA provides for personal liability for damages arising from a fiduciary who breaches

13   his or her responsibility to the plan. 29 U.S.C. §1109(a). The Ninth Circuit has long held that

14   officers of a corporation are functional fiduciaries who can incur personal liability, even if the

15   corporation was the only beneficiary of the fiduciary breach. *Kayes v. Pacific Lumber Co.*, 51

16   F.3d 1449, 1459 (9th Cir. 1995). The evidence reflects that the Mays exercised control over the

17   company and Western has provided no evidence to the contrary.

18       Accordingly, the undersigned concludes that the Mays and their Marital Community are

19   personally, and jointly and severally liable with Western, for the delinquent vacation and PTO

20   contributions ($4,264.23), interest ($316.95), and liquidated damages ($750.00) as reflected in

21   the Audit Report. Dkt. 53, Rodriguez Decl., ¶ 9.

22

23

1    D.    <u>Liquidated Damages and Interest</u>

2            ERISA § 515 obligates an employer to remit contributions to multiemployer plans

3    required "under the terms of the plan or under the terms of a collectively bargained agreement."

4    *Laborers Health and Welfare Trust Fund For Northern California v. Advanced Lightweight*

5    *Concrete Co, Inc.*, 484 U.S. 539, (1988); 29 U.S.C. § 1145. ERISA § 502(g)(2) provides that in

6    the event of a judgment pursuant to action to collect delinquent contributions, the court shall

7    award to the Trust Funds reasonable attorney fees and costs, interest on the unpaid contributions,

8    liquidated damages, and other such legal or equitable relief. See 29 U.S.C. § 1132(g)(2)(A)-(E).

9            29 U.S.C. § 1132(g)(2) provides that in an action to recover delinquent contributions in

10   which a judgment in favor of the plan is awarded, the court shall award the plan—

11            (A)    the unpaid contributions,

12            (B)    interest on the unpaid contributions,

13            (C)    an amount equal to the greater of—

14                    (i)    interest on the unpaid contributions, or

15                    (ii)    liquidated damages provided for under the plan in an
16   amount not in excess of 20 percent (or such higher percentage as may be
     permitted under federal or State law) of the amount determined by the
     court under subparagraph (A),

17

18            (D)    reasonable attorney's fees and costs of the action, to be paid by the
     defendant, and

19            (E)    such other legal or equitable relief as the court deems appropriate.

20           "Section 1132(g)(2) is 'mandatory and not discretionary.'" *Nw. Adm'rs, Inc. v.*

21   *Albertson's, Inc.*, 104 F.3d 253, 257 (9th Cir. 1996) (quoting *Operating Eng'rs Pension Trust v.*

22   *Beck Eng'g & Surveying, Co.*, 746 F.2d 557, 569 (9th Cir. 1984)). For a court to grant a

23   mandatory award under § 1132(g)(2), "the following three requirements must be satisfied: (1) the

employer must be delinquent at the time the action is filed; (2) the district court must enter a judgment against the employer; and (3) the plan must provide for such an award." *Id*.

Here, all three requirements for a mandatory award under § 1132(g)(2) are met. Western was delinquent in its contributions to the Trust Funds at the time this lawsuit was filed. Ironworkers Trust Funds is entitled to judgment against Western for those delinquent contributions under § 1145, as it has not established any basis to excuse it from its obligation to contribute to the Trust Funds and remains delinquent. Finally, the Trust Agreements provide for liquidated damages, interest, and attorneys' fees, and court costs. *See* Dkt. 54, Bayne Decl., Exs. B–F.

<u>CONCLUSION</u>

In summary, the undersigned recommends **granting** the motion for summary judgment of Ironworkers Trust Funds (Dkt. 52) and **denying** Western's cross-motion for summary judgment (Dkt. 55). Judgment should be entered in favor of Ironworkers on their ERISA claims against Defendant Western Rebar Consulting, Inc. d/b/a Western Industries, Inc., ("Western") for contributions of $92,014.36, minus $3,312.62 identified as overpayments in the audit for pension, annuity and apprenticeship funds, $32,695.55 in liquidated damages, $60,117.661 in interest, and $16,006.85 in accounting fees. Ironworkers should be directed to submit a motion for their attorney fees and an updated interest calculation.

The Trust Funds are also entitled to an order of summary judgment against Defendants Duane May, Jr. and Betsy May, jointly and severally, and their marital community, for a portion of the above contributions consisting of $4,264.23 in vacation/PTO contributions, withheld from employee paychecks, $750.00 in liquidated damages and $316.95 in interest.

**OBJECTIONS AND APPEAL**

This Report and Recommendation is not an appealable order.  Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **September 7, 2021.**  The Clerk should note the matter for **September 9, 2021**, as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed seven (7) pages.  The failure to timely object may affect the right to appeal.

DATED this 23rd day of August, 2021.

BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 25